Your Honors, the second and final case on the docket is number U-25-025, Deer Ridge Properties, LLC, et al, v. Mr. Thomas and Collin Kim, in her official capacity as both county treasurer and executive sealer and the collector, v. Ms. Appellini. Arguing on behalf of the appellant, Mr. Timothy Dwyer. Arguing on behalf of Ms. Appellini, Mr. George A. Acosta. All right, counsel, the third member of our panel, Justice McLaren, could not attend this morning, but he will listen to the audio recording of today's arguments before we deliberate. So with that, counsel, you may proceed. Thank you, Your Honor. May it please the Court, my name is Timothy Dwyer on behalf of the taxpayers. I believe this is an important tax-free levy objection case before the Court. If, in fact, the school districts are right and they can use their O&M fund as a magic fund and transfer monies into their capital projects fund and debt service fund, then essentially there would be no such thing as a tax-free levy objection against any school district. They could simply transfer the money at whim, wherever they wanted, to avoid the Miller Ratio. I think that's a critical import of today's case. During the argument on emotions for summary judgment, Mr. Reichert said, if the transfers are excluded from the equation, then a plaintiff has, you know, established a Miller Ratio over 2. But if the transfers are included as fund uses or expenditures for purposes of the Miller analysis, then the Miller Ratio is far less than 2. That's correct, Your Honor. And you agree with that statement? I think the statement is essentially correct. But the problem with it is the transfers. They're using transfers as expenditures. You can't move money around that way. Pardon me? You can't move funds around that way. Well, there's two things. I mean, Section 172A gives the school districts an enormous amount of latitude in terms of transferring monies from their operational funds. So long as they have public notice and a hearing, then they can do that. For example, if they want to go from their education fund to their transportation fund or their O&M fund, they can. But if these transfers, Your Honor, with their transfer money, for example, 112, transferred over $5 million to their O&M fund, and they use it as a pass-through to pay for debt service and capital projects. It's not actually a transfer to the O&M fund. They're not using it for O&M purposes. They're using it for capital fund project purposes. Is there any circumstance in which any funds from O&M could be transferred to capital projects or debt service? Not under the law, Your Honor. No. Capital projects funds are not – of the 956 school districts in Illinois, there's a significant portion of those that don't even have capital projects funds. Capital project funds are established pursuant to, in large part, bond issues. And I've given the court the law with regard to that. Once a school district issues a bond issue, referendum or no referendum, it doesn't matter. What happens is that the county clerk has to set a rate for that bond issue for both the principal and the interest. What's happening here is these school districts, in spite of the fact that they've actually passed referendums, are overtaxing their O&M levy for purposes of supplementing their capital projects fund and their debt service. There's no authority within the school code to do that. What about the administrative code? The administrative code, Your Honor, is an accounting regulation. And when you look at it, it definitely goes towards bond issues. It references bond issues. And if you look at the definition in the administrative code, transfers to O&M aren't in there. Bond issues are impact fees, capital leasing arrangements. Those are the things that happen. And those would be pledged funds within an agreement. Exactly, exactly. The terminology pledged, it's commonly understood to mean a promise to pay. Right. That these are where those funds are going, and that's what you're saying when you... What do you mean by these funds? When you said these are where these funds are going. That's what you're...that's pledged. That's right. Those are pledged funds. That's right. There's no such thing as pledging your O&M funds for capital projects or debt service. So the word pledged in the reg removes this from the argument that the districts are making, right? Perhaps it does, Your Honor, but more important, this is an accounting regulation. And the genesis of this regulation relates back to the establishment of a capital projects fund. Now, as I said before, there are many, many school districts that don't have one. How a capital projects fund is established is almost 100% of the time done pursuant to a bond issue. Okay. So when they're taking this accounting regulation and trying to use this incredibly broad general verbiage to establish a power that does not exist in the Illinois school code, it's just meritless. And moreover, what's very problematic about this case, in the trial court, but not in the appellate court, the school districts come forth and say, Your Honor, this is a common practice. This is happening all over the state of Illinois. And, in fact, it is. The school district lawyers are teaching this at conferences. And they're saying, This is how you can fund your capital projects fund without a referendum. And we referenced a case in our brief on the Henry County case that I think is highly relevant to this case. And in that case, it was a rural district. And the board members testified. And in their testimony, some of the board members couldn't even identify when they passed the levy, i.e. in December of every year. But they didn't know one thing. They said that we have the legal ability to transfer education fund monies to capital projects so long as we transfer it to O&M first. Now, they didn't know some of the very, very basic issues regarding the levy. But they knew that. How did they know that? Because they go to these conferences, and that's what's taught. This is how we do this. I didn't see that in the record. Is that in the record that there are taught this at conferences? No, Your Honor. I'm just trying to give you some context. Mr. Davis and also Mr. Nicholas Cavallari from Baker Tilly both testified that they couldn't identify anything in the school code, but they relied upon the administrative regulation. That's right. And that's what's being taught, you say? Absolutely, yeah. And, again, you know, and I guess we did this in the trial court as well, but the fact of the matter is that even in the best-case scenario, if the school districts are right and these monies pledged meet their O&M fund, and then they can use their O&M fund as a magic fund to transfer it to anyone they want, that supersedes the authority derived from the statute, you know, to a school code. If he actually wanted to do this, they couldn't. But the real genesis for this rule is that when an unsophisticated or perhaps a rural school district would do a bond issue, whether it be working cash bonds, alternative revenue bonds, general bonds, there's a plethora of possibilities. But what this rule means is that this administrative rule on accounting that they rely on, what this rule means is that once you do that, you have to set up a capital projects fund and a debt service fund. Because what was happening is that you'd have a rural district issue a small bond, and what they would do is they'd just take the money and they'd put it in their O&M fund. Because they didn't know anybody. And that's really the genesis of this rule. And this rule is an accounting rule. If you look at the title, it's accounting and budget. It's not about the power to transfer money. That doesn't exist. It doesn't have the power to do that. What are sources of input to the capital projects and debt service funds other than bond issues? It's delineated in the definition that's attached to the administrative code. I don't know the seven off the top of my head. But impact fees, capital leasing improvement agreements, other than bond issues, they're all marginal. You know, impact fees are never going to build a school, earn them by sight. And the same thing with capital leasing and those things. But you can have blended capital, blended sources, right? Absolutely. So you can have any of those six or seven sources listed in the definition. I can use both if you want. You still have to set up separate funds. Pardon me? You still have to set up separate funds. Absolutely. And none of those sources include operations or ed fund. Under no circumstances do they do, Your Honor. No. And that's the whole thing here. You know, the school code was set up so that all these individual funds are, you allow for these individual funds as needed. And obviously that changed in 2003. And the sunset provision has been renewed numerous times. And in one of those iterations, they actually included the torn immunity fund. Under the school district's theory in this case, in the theory that the trial court endorsed, they can literally lobby $10 million for their torn immunity fund, turn around and transfer it to their OM fund, and then use that for capital projects in debt service. That's completely absurd. And that would never, ever be the intention of the school code. The school code prior to 2003 was incredibly tight, and that's because your school taxes are essentially two-thirds of your ad valorem taxes that people pay throughout the state of Illinois. Now, so it's set up so you have your education fund, your transportation fund, your OM fund, and those are your primary operational funds. Now, as it exists under 17-2A, with the ability to transfer those monies simply by public notice and a public hearing, they can manipulate those to avoid the Miller Ratio. But in this case, it's only one step further. They're saying so long as we transfer it to the OM fund, our little magic fund, we can transfer those funds to capital projects and debt service. The result of which, why not just take, for example, 112 took over $5 million, and they put it into their, they didn't put it into their OM fund. They used the OM fund as a transfer mechanism to pay debt service and capital projects. Why not just transfer it straight from an education fund to a capital projects fund? Well, if it's- Well, isn't that an operation- Pardon me? Isn't that an operation of their argument that under 17-7 that the OM fund can be used for capital improvement because the word improvement is in it? That is, you know. That's one of their arguments, and it's very, very uncompelling. So why does an improvement mean capital improvement? Pardon me? Why does the word improvement in that section not include capital improvement? Well, if you read the whole section, Your Honor, there's two reasons. If you read the whole section, it basically says here's what you can levy for your OM fund, and at the end it says all other expenses will be pursuant to 17-8, and they reference the transportation fund and the educational fund. So they're saying here's what you can use for your OM fund. Now, this goes back to the fact that a lot of school districts don't have a capital improvement fund. They have an issue to bond, and there is no capital improvement fund. So obviously they might have to make improvements in their infrastructure, and they're allowed to use the OM because it's operations and maintenance. It's not capital projects. They're two separate funds. The legislature made them two separate funds. Capital improvements, capital construction costs, capital improvement funds, are used for major rehabilitations, new sites, and so forth. What about, let's say, asbestos abatement on an old building? Those can be enormous projects expense-wise. Can that be paid for through O&M, or does that require a bond issue? I think that's an issue. I think, you know, there's a question with regard to that. But the important thing about this case is it's not about that. There is no asbestos replacement. In this particular case, they both have capital project funds, and they've been using those capital project funds for decades. But what they're doing is they're overtaxing O&M in order to supplement their capital projects fund. So, Your Honor, if that was an issue, if someone said, you know, listen, this asbestos abatement thing is going to cost me $6 million, then, you know, maybe that would be a triable fact. It's not exactly, it's not eminently clear as to what is a capital improvements cost as opposed to an O&M cost. But what is clear is that the levies in this case for the O&M fund are being used for interest payments and capital improvement payments for bond issues, and that's not proper. One question that you raised here, this was summary judgment. What are the material issues, in fact, to be determined in your estimation? Your Honor, this is a question of law. We filed a motion for summary judgment to adjudicate the issue as to whether or not they could transfer monies from their O&M fund to the capital projects fund and debt service fund. That's purely a question of law. All right. Thank you, counsel. You will have time on rebuttal. Thank you, Your Honor. And Mr. Acosta, you may proceed. Feel free to move the microphone if you need to. May it please the Court, my name is George Acosta, and my firm represents the Board of Education of North Shore School District Number 112 and the Board of Education of Township High School Districts Number 113, the intervenors appellee in this matter. I want to begin by noting that Mr. Dwyer was unable to answer the question from Justice Kennedy regarding Section 17-7 of the school code, which unambiguously provides that such the taxes levied for operations and maintenance purposes can be used for, among other things, improvement of school buildings. Improvements is a broad term under which capital improvements would fall. The taxpayers' briefing and arguments, including just now, fail to address and reconcile this on-point school code provision with the statute, and their failure to do so is telling. The counts on appeal relate to each school district's 2022 tax levy for operations and maintenance purposes. What does the word pledged mean in the context of the administrative code, Section 100.5D? Pledged means that the school districts had set aside these funds for the purposes of capital improvements and or debt service. And how does that then jive with what you're actually doing? You're taking education funds to O&M, transferring to O&M funds, and then O&M funds into capital improvements and debt service. That's why counsel called it the magic fund. Well, I disagree with that characterization. The vast majority of transfers in this case that are at issue were directly from operations and maintenance to the capital projects fund or the debt service fund. District 112 did have transfers from the education fund to the operations and maintenance fund, but those transfers were appropriate under the statutory mechanism under which they did the transfer. How did any of those funds meet the definition of pledged funds? Well, for example, District 112 had... And tell me, when did the pledge take place? Well, for example, District 112, when they issued their alternate revenue bonds, had the pledge that the bonds would be funded by taxes levied for operations and maintenance purposes. So that's a pledge right there. The taxpayers cannot prevail on their claims unless and until they prove, through clear and convincing evidence, that these transfers were not only made without legal authority, but that the transferred amounts must be constructively added back to the respective operations and maintenance funds as amounts available under the Miller analysis. These unprecedented and unsupported legal theories must be rejected. At the outset, these transfers in no way hurt the taxpayers, because the school districts only made these transfers to procedurally comply with ISB regulations prior to making expenditures on capital improvements and or debt service that financed these improvements. These transfers were not done for purposes of accumulation or building a cash surplus, and no evidence suggests otherwise. Additionally, District 112 abated its debt service levy based on these fund transfers, which actually helped the taxpayers avoid a separate and additional tax levy for that fund. Further, as noted in our brief, the trial court expressly found that these transfers were not done for purposes of building cash or maintaining a surplus, but found that these were done for the opposite purpose, to make payments that were authorized by the school code. In other words, the transfer- Where in the school code are they authorized? Well, the school code provision that we were just discussing, Section 17-7, that authorizes taxes levied for operations and maintenance purposes to be used for improvements of school buildings, that provision would authorize the school districts to make these expenditures directly out of their O&M fund, but these ISB regulations require the school districts to transfer the funds prior to making the expenditures. In other words, the money, as I said, could have been spent directly out of the O&M funds, but for the ISB regulations, the transfers were required. Accordingly, neither school district abused their discretion, and summary judgment must be affirmed. As I mentioned, the taxpayers failed to present any evidence, much less clear and convincing evidence, showing that the school district's intent in making these transfers was to accumulate funds. The taxpayers have claimed that intent is not a consideration, but that claim is belied by Illinois Supreme Court precedent, such as Wallenbach v. Chicago and Northwestern Railroad Company, which held that an abuse of discretion is shown only when the intent of the taxing body in making the levy is to provide a surplus for other purposes or is grossly excessive and shows an intent to accumulate funds faster than are likely to be needed. There is no evidence of such intent by either school district in this case, and summary judgment must therefore be affirmed. The taxpayers argue that the Administrative Code, Part 60, defining capital projects fund or fund group, requires a separate fund shall be established for each project. I'm not quoting it word for word, but that's accurate, correct? There has to be a separate fund established for each capital project? I believe the capital projects fund is used for the district's capital projects in general. So the transfers from O&M to that fund to be used for capital projects purposes were appropriate and in accordance with ISB regulations. As it relates to debt service, there was yet another statutory source of authority for the fund transfers. So you're basically agreeing that money was raised from the levy at the O&M fund, a portion of which was intended to be transferred later on to capital projects fund. Can you repeat that? That's basically what you're saying, that it's okay to do this, even though the Administrative Code requires a separate fund for each project? Your Honor, the taxpayers didn't raise that issue in their briefing. Well, I'm asking you. I believe the capital projects fund is a fund that is used for the district's capital projects in general. As it relates to debt service, there was yet another statutory source of authority for the fund transfers. The Local Government Debt Reform Act provides that general obligation bonds may be issued payable from any revenue source and without any referendum. Property tax revenue surely qualifies as any revenue source, and the bonds issued by North Shore 112, which were vetted and approved by the district's bond council, fully accord with the statutory provision. In addition, this framework enabled District 112 to fund its capital improvements without having to complete an additional levy for the debt service fund, protecting the taxpayers from additional tax burden. The taxpayers glom on to the idea that a referendum is always required for a school district to finance capital projects, but this argument is not supported by any legal authority. In fact, this Court held the opposite in the case 1001 Ogden Avenue Partners v. Henry. Further, the taxpayers said to the capital improvement tax provision of the school code to ostensibly support their claim, but that tax is not at issue here and the districts were not required to implement that tax. Notwithstanding, that school code provision notes that the capital improvement tax may be used in addition to the to fund capital improvements. As to the ISB regulations, the taxpayers attempt to collaterally attack the validity of these ISB rules, but the taxpayers have forfeited this argument by not developing it in the trial court nor in their appellate briefing. In fact, the taxpayers failed to even cite to the statutory provision, which promulgates rulemaking authority to ISB, nor is ISB a party to this litigation. Furthermore, when reviewing administrative rules and regulations, a court will not set them aside unless they are clearly arbitrary, unreasonable, or capricious. ISB is also entitled to substantial discretion as to its construction and interpretation of its own rules, and the taxpayers have not produced any evidence to show that ISB exceeded its rulemaking authority in promulgating these regulations, nor that they are clearly arbitrary, unreasonable, or capricious. Accordingly, the school districts complied with these regulations by transferring monies from their operations and maintenance fund to their respective capital projects and debt service funds during the years preceding the 2022 levy, prior to making corresponding payments out of those funds. As previously noted, school districts across the state make these transfers on a regular basis, and template ISB accounting forms even provide line items for such transfers. Let me ask you this. The objectors cite people at Carroll Harding v. CNW Railway Company for the proposition that two funds are separate and distinct and one cannot be used to augment the other by a levy which is excessive and unnecessary and far in excess of the needs of the district. Why is that wrong? That is wrong because in that case there was evidence that there was an element of subterfuge being used by the taxing body. Does there have to be an element of subterfuge in order to find that there's not been compliance with the law? In the context of an excess accumulation claim, the Supreme Court precedent I previously cited indicates that the intent of the taxing body is a consideration, and here there is no element of subterfuge or any malintent other than the only purpose for the transfers was to comply with the ISB regulations. As I mentioned, the objectors also argue this, that if the monies expended and transferred were truly operations and maintenance expenses, then the districts would have reported their O&M expenses and the O&M expenses to the Illinois State Board of Ed and would have included these expenses in the O&M comprehensive financial audit reports. How do you respond to that? For purposes of the Miller excess accumulation formula, the two options are amounts available, assets on one side of the ledger, or expenditures on the other side of the ledger. By using these funds to transfer them for purposes of making corresponding payments and the fact that these funds have been pledged for such purposes, they cannot rationally be included on the amounts available asset side of the ledger under Miller, and therefore they're properly included on the expenditure side. And with that understanding, the taxpayers How can they be in expenditure twice? For purposes of Miller, they're in expenditure once. So that's what matters in this case. Additionally, the taxpayers cannot prevail on their excess accumulation claims unless they can constructively add these transferred amounts back to the operations and maintenance fund as amounts available under Miller. On the latter point, even if these transfers were deemed to have been made without authority, it would be irrational to constructively add these amounts as assets to the operations and maintenance funds because the monies had already been pledged and or spent upon transfer to the debt service and or capital projects funds. Indeed, if not for these deregulations, the school districts would have simply made the payments directly out of the operations and maintenance funds consistent with their statutory authority to do so. Further, no case law suggests that constructively adding transferred amounts from two to three years before the levied issue is an appropriate remedy. The taxpayers could have objected to these transfers within the statutory timeframe after they occurred, but they failed to do so. I also want to briefly address Illinois Public Act 103-394, which effectively set a new threshold for excess accumulation claims. Prior to the act, it was well established that a prima facie case could only be made by showing that the assets available to the fund at the end of the fiscal year preceding the levied issue exceeded two to three times of the taxing body's foreseeable expenditures for that fund. However, the act adjusted the two to three times standard to a set number of 2.5 times the average annual expenditures, at least as it relates to a school district's operational funds. As set forth in our brief, we believe that the legislature's use of the Miller formula in this statute clarifies the threshold for an excess accumulation within the school district's operational funds. This legislative clarity enables courts to implement this precise threshold moving forward in excess accumulation cases, which provides more certainty to school districts and taxpayers alike in comparison to Miller's vague two to three times standard. That said, regardless of whether the traditional two to three times standard applies or the 2.5 times standard applies, the school districts prevail as a matter of law because the taxpayers cannot establish a Miller ratio above 2.0 against either school district. As to the taxpayers' arguments about inter-fund transfers and the requirement for notice in a public hearing regarding transfers amongst the operational funds, this law does not apply to the transfers in this case. This is because the transfers here do not modify or expand the scope of use for the funds at issue. Conversely, when a district transfers funds from, for example, the Tort Immunity Fund to the Transportation Fund, that transfer changes the scope of use for those funds. Notice in a public hearing on such transfers is appropriate and consistent with case law that establishes the public's right to know how public money is being spent. Regarding the transfers here, the school code already informs the public that operations and maintenance tax revenue can be used for capital project expenditures, which nullifies the need for notice in a public hearing. When is notice in a public hearing required, then? When a school district is transferring funds between its operational funds because, as I mentioned, that changes the scope of use for those funds and the public has a right to know of what public funds are being used for. The taxpayers also identify certain transfers from District 112's education fund to its operations and maintenance fund, and the taxpayers argue that monies within the education fund cannot be used for capital project purposes. However, these transfers were specifically authorized by Section 17-2A of the school code for any purpose, and at any rate, the taxpayers' challenge to District 112's education levy is not before the court. The school districts prevailed on this count in the trial court, and the taxpayers did not appeal that ruling. They only appealed the challenges to District 112's and District 113's operational and maintenance levy. Lastly, the school district's position is that the constitution must appeal, barred under the doctrine of... Your time is up, but do you want to quickly address, which you haven't yet, the collateral estoppel argument in the 2019 Ortiz ruling, and where in the record can we find the ruling which is not precedential and should not have been presented as even persuasive authority in the trial court? Where is that in the record? We included a copy of Judge Ortiz's order within the record. I don't have the precise... It's not attached to your brief, is it? We cite to it in the brief. Give me one moment here. We cite to it at C1720-1725 and C734. Thank you. Thank you, Your Honors, for your time. Thank you very much, Counsel. Mr. Dwyer, you may begin your rebuttal when ready. Thank you, Your Honor. Thank you, George. There is no element of subterfuge. The transfers are illegal or they're illegal. Well, the intent... Oh, yeah, my levy was illegal, but there was no mens rea. There is no law supporting that position, and it's at best uncompelling. A lot of times, Mr. Acosta said, for purposes of the Miller formula, and what he was referring to is the Miller formula that the school district created here. It's an entirely new thing. What they're saying is that the transfers could be used as expenditures for the last three years, and by virtue of that, I escape the real Miller formula. So when he says, for purposes of the Miller formula, I think the court needs to take that into context. And it's just simply something that they made up. There's no legal basis for their formula, because the Miller formula is established. You take the last three years of expenses for one fund, and you average it out, and you go from there. And, you know, they have a ratio. Now, they also said, without saying so, is that this new statute, which if one of the operational funds are above 2.5, the school district has to report to ISBE and say how they're going to lower that within three years. And voila, that creates an entirely new access accumulation standard for the law for school districts in the state of Illinois, notwithstanding the case law of the last 150 years. There is no basis for that. The statute doesn't even talk about tax levies, taxes, levies, or anything else like that. What it does is it mandates that a school district, which has an operational balance of over 2.5, needs to do something about that. And that's it. To suggest that that statute, which doesn't reference taxes or levies, eviscerates this court's holding in allegiance is meritless. It would be simple for this court to say, you know what, the statute doesn't apply because it has no retroactive effect for this particular tax case. We have a couple more down the pipeline, and if the court elects not to address that issue, I fear that we're going to be back in another year saying, you know, is this the case? I hope that in the interest of the public interest doctrine, the court does address that issue. I think it would be judicially expedient, and I think it would be very, very important with respect to the law of tax rate levy objections in the state of Illinois. Justice Breyer, you asked counsel, how do you expend things twice? And quite frankly, that was never answered. I think counsel was arguing that for purposes of counting principles, that's what they did. For counting principles. Right, and they make that up. They don't use their transfers as expenditures in the audited statements that they provide to NSBE or in their independent audit. They simply do not do that. That's a fact. So what they do is they come in here, and this is related to their for purposes of the Miller formula. They simply make up this idea that transfers are expenditures. Now, in the case of 112, they literally had transfers as expenditures three times. They transferred over $5 million from their education fund, and they considered that to be an expenditure to their O&M fund. Then they transferred that money from their O&M fund for debt service, and they considered that to be an expenditure from their O&M fund. And then finally, of course, it was actually an expenditure for the debt service fund. You can't do that. Even Mr. Davis testified that it's either a transfer or an expenditure. And then if you look at his testimony in there, what he says is, well, for purposes of the Miller formula. So they drafted these affidavits, and they ran his testimony by that for purposes of the Miller formula, we're going to count these things several times. Well, there's absolutely no basis for that. And how that escaped the trial court, I'm not certain. Can I just say one thing really quick? This idea that there's no, this Illinois school code allows transfers between operational funds, but there has to be public notice in a public hearing, which, by the way, is antiquated. What they should really do is have public notice on the website. That's where everybody looks. But in any event, what the school districts are saying is that once our transfer of the education fund to the O&M fund is complete, we don't need to do any more public notice because the administrative code governing accounting regulations does not mandate it, and the scope of the funds is the same. Again, that's a meriless argument. That's all I have to say.